

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-12-00143-CV

INTEGRATED OF AMARILLO, INC. D/B/A
PLUM CREEK HEALTHCARE CENTER, APPELLANT

V.

CLEO KIRKLAND, APPELLEE

On Appeal from the 181st District Court
Potter County, Texas
Trial Court No. 98,326-B, Honorable John B. Board, Presiding

January 30, 2014

OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

Appellant Integrated of Amarillo, Inc. d/b/a Plum Creek Healthcare Center ("Plum Creek") appeals from the trial court's judgment in favor of appellee Cleo Kirkland. We will affirm the judgment of the trial court.

Background

On December 24, 2007, Kirkland was injured when he stepped out of his pickup truck. The pickup's transmission apparently was in reverse instead of the park position, because as Kirkland stepped out, the vehicle moved backward. Kirkland was knocked down, and the pickup's front tire ran over and broke both of his legs.

The fracture of Kirkland's left leg did not require surgery. The right leg injury was more severe, with fractures of both the tibia and the fibula. Dr. Brendan Albracht performed surgery on December 25, described as an open reduction internal fixation that included the placement of screws and plates in the right leg. Albracht testified that when he saw Kirkland he also had abrasions to both legs and swelling. Albracht described Kirkland's postoperative course as "benign with the exception of the administration of pain medication. He explained that by benign, he meant "[t]here were no complications that arose during that time period that he was seen at the hospital at BSA."

Two days after the surgery, on December 27, Kirkland was transferred from the hospital to Plum Creek for rehabilitation. Nursing notes from Plum Creek show the presence of "fracture blisters"[1] on his right shin and along the back of his right calf. Five days after surgery, a Plum Creek nurse applied Silvadene, a prescription antibiotic

---

[1] Testimony showed fracture blisters may form on skin overlying a fractured bone, resulting from seepage of fluid from severely injured tissue. Kirkland had multiple blisters, some "quite large." He had one on the posterior calf that was "quite large and multiples down in the midshaft of the tibia."

cream,[2] to the fracture blisters, despite the absence of a doctor's order prescribing the cream.

On December 31, Kirkland was transferred back to the hospital for treatment of a deep venous thrombosis in his right leg. Beginning on January 2, 2008, he was seen by Dr. Taylor Carlisle, an infectious disease specialist. On January 4, 2008, Kirkland was transferred to another facility. The condition of his right leg worsened over time. On January 16, a dermatologist performed a debridement of dead skin from his leg. Albracht was notified that during debridement, the end of the plate in Kirkland's leg was exposed. After consultation, the decision was made to amputate the right leg above the knee, a procedure Albracht performed on March 5, 2008.

Kirkland was 74 at the time of his accident. Plum Creek's records contained a notation that Kirkland is allergic to sulfa, an ingredient of Silvadene. Kirkland complained of an extreme burning sensation after application of the cream. Medical records also show Kirkland has a twenty-year history of diabetes and has peripheral vascular disorder.

Kirkland later filed suit alleging that the application of Silvadene was negligent and that it proximately caused the amputation of his leg due to an allergic or adverse reaction which caused necrosis of the skin of his leg. Kirkland sought to recover damages under Chapter 74 of the Texas Civil Practice and Remedies Code for his injuries.

---

[2] The antibiotic's package insert is in evidence. It generally describes Silvadene Cream 1% as "a soft, white, water-miscible cream containing the antimicrobial agent silver sulfadiazine in micronized form."

After a non-jury trial, the court entered judgment in favor of Kirkland. Thereafter, the court filed its findings of fact and conclusions of law. Plum Creek now appeals, raising three issues, contending (1) the court heard no testimony from a qualified expert; (2) the court heard no reliable expert testimony on proximate cause of Kirkland's skin necrosis and later amputation; and (3) evidence supporting the amount of past medical expenses awarded was legally or factually insufficient.

Analysis

Qualifications of Expert

Kirkland's expert witness at trial was Dr. Albracht, a board-certified orthopedic surgeon. Albracht performed both the initial surgery to repair Kirkland's leg and the later amputation. At trial, Albracht expressed his opinion Kirkland suffered an adverse reaction to the application of Silvadene which led to skin necrosis and ultimately to the amputation of his leg. During his testimony, Albracht said that as an orthopedic surgeon, he is not a "skin doctor." He also acknowledged he is not an expert on Silvadene, knew nothing of its properties other than its common use on burns and blisters, and based his testimony about the drug on the drug's package insert, online research and what he read in the Physician's Desk Reference and other textbooks after litigation commenced. By its first issue, Plum Creek argues Albracht was not qualified to give an opinion that the application of Silvadene proximately caused the amputation of Kirkland's leg.

Kirkland contends Plum Creek's objection to Dr. Albracht's qualifications may not be asserted for the first time on appeal, and we agree. By statute, Plum Creek was

4

required to object to Albracht's qualifications as an expert witness on causation no later than 21 days after the date Plum Creek received a copy of his curriculum vitae or the date of his deposition.[3] TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(f) (witness in suit against health care provider); § 74.403(d) (witness on causation in health care liability claim) (West 2005); *see Ocomen v. Rubio*, 24 S.W.3d 461, 464 (Tex. App.—Houston [1st Dist.] 2000 no. pet.) (applying similar provision of former article 4590i).

Plum Creek's decision to forego raising a pretrial objection to Albracht's qualifications precludes its assertion now on appeal.[4] We overrule Plum Creek's first issue.

Reliability of Expert Opinion Testimony

Through its second issue, Plum Creek attacks the reliability of Albracht's causation opinion testimony, asserting his opinion is unsupported by a factual foundation and is conclusory, based only on "possibilities, speculation and surmise."

---

[3] A party may object after expiration of the 21-day period under some circumstances. TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.402(f), 74.403(d) (West 2005). There is no suggestion such circumstances are present here.

[4] Moreover, under case law an objection to the qualifications of an expert witness must be made before trial or when the evidence is offered. *See Duncan-Hubert v. Mitchell,* 310 S.W.3d 92, 105 (Tex. App.—Dallas 2010, pet. ref'd) (summary judgment; collecting cases). Plum Creek raised an objection at trial to one question posed to Albracht.

*Error Preservation*

Kirkland responds initially that Plum Creek may not bring its challenge to the reliability of Albracht's opinion testimony for the first time on appeal. We begin by addressing that contention.

Opinion testimony that is conclusory or speculative is objectionable as lacking relevance because it does not tend to make the existence of a material fact "more probable or less probable." *Coastal Transp. Co. v. Crown Cent. Petro. Corp.,* 136 S.W.3d 227, 232 (Tex. 2004) (*quoting* TEX. R. EVID. 401). But even if admitted without objection, an expert's bare unsupported conclusion amounts to no evidence and will not support a judgment. *Id.* (citations omitted). Thus a party may complain that conclusory opinions are legally insufficient evidence to support a judgment even if no objection was raised to the admission of the opinion testimony. *City of San Antonio v. Pollack*, 284 S.W.3d 809, 816 (Tex. 2009) (*citing Coastal Transp. Co.*, 136 S.W.3d at 232).

However, when the contention makes it necessary for the court to evaluate the underlying methodology, technique or foundational data used by the expert, an objection must be timely made so the trial court has the opportunity to conduct this analysis. *Coastal Transp. Co.,* 136 S.W.3d at 233. Otherwise, the opinion's proponent is denied "a fair opportunity to cure any deficit and thus prevent trial by ambush,"[5] and the trial court's role as gatekeeper is usurped.[6] Challenges to the expert's scientific

---

[5] *See Pollack*, 284 S.W.3d at 817 (*citing Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 409 (Tex. 1998)).

[6] *See Maritime Overseas*, 971 S.W.2d at 411 (citations omitted).

methodology, in which "the court necessarily looks beyond what the expert said to evaluate the reliability of the expert's opinion," *id.*,[7] are to be distinguished from a no-evidence challenge asserting that on the face of the record, the evidence lacked probative value. Thus, "when the challenge is restricted to the face of the record -- for example, when expert testimony is speculative or conclusory on its face -- then a party may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility*." Id.* Said another way, "even when some basis is offered for an [expert] opinion, if that basis does not, on its face, support the opinion, the opinion is still conclusory." *Pollock*, 284 S.W.3d at 817; *see Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009) (expert opinion might be conclusory because based on tests or data that do not support the conclusions reached; such an opinion is not probative evidence).

Review of Plum Creek's argument in support of its second issue reveals statements that could be read as challenging the foundational data underlying Albracht's causation opinion, a challenge that must be raised at trial. *Coastal Transp. Co.,* 136 S.W.3d at 233. However, we find the substance of Plum Creek's reliability challenge to the expert opinion testimony does not require us to look beyond what Albracht said to evaluate its reliability. Instead, Plum Creek asserts Albracht's opinion that the application of Silvadene caused Kirkland's skin necrosis is not probative on its face and is conclusory and speculative. Accordingly, Plum Creek's decision not to raise its complaints about the reliability of the opinion testimony by objection in the trial court

---

[7] Quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997).

7

does not preclude its assertion on appeal that the testimony is conclusory and constitutes no evidence of proximate cause. *Pollock*, 284 S.W.3d at 817.

*Proximate Cause*

It is undisputed the application of Silvadene to Kirkland's leg without a doctor's order and with the medical record notation of his allergy to sulfa was a breach of the standard of care expected of a health care provider like Plum Creek. There is no question Kirkland suffered the eventual amputation of his leg made necessary by the loss of skin. His burden at trial included, however, the burden to prove that Plum Creek's breach of the standard of care caused his injury. Two causal nexuses must be established to authorize recovery: (a) a causal nexus between the defendant's conduct and the event sued upon; and (b) a causal nexus between the event sued upon and the plaintiff's injuries. *Jelinek v. Casas,* 328 S.W.3d 526, 532 (Tex. 2010).

The causal nexus Kirkland was required to show to support recovery is proximate cause,[8] which consists of two elements, cause-in-fact and foreseeability. *IHS Cedars Treatment Ctr., Inc. v. Mason*, 143 S.W.3d 794, 798-99 (Tex. 2004). The test for cause-in-fact is whether the act or omission was a substantial factor in bringing about the injury "and without it, the harm would not have occurred." *Id*. at 799. More than one act may be the proximate cause of the same injury. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 784 (Tex. 2001). The evidence must establish the elements of the claim to a reasonable medical probability. *Jelinek*, 328 S.W.3d at 532-33.

---

[8] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(13) (West 2011) (defining health care liability claim to include element that action "proximately results in injury to or death of a claimant").

8

"[W]hen the facts support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion." *Jelinek*, 328 S.W.3d at 536 (*citing Lenger v. Physician's Gen'l Hosp., Inc.*, 455 S.W.2d 703, 707 (Tex. 1970)).

With regard to the causal nexus between Plum Creek's conduct in administering Silvadene to the leg and the necrosis of the skin, the three physicians who testified at trial generally agreed on several conclusions.[9] They all agreed Kirkland had many conditions that could have contributed to the skin death. Although Albracht agreed that conditions such as Kirkland's age, his history of type II diabetes, his crush injury involving fractures to both the tibia and fibula, the resulting surgery to repair the bones, and the development of fracture blisters indicating serious trauma to the skin are factors that lead to necrosis in many patients, he attributed the necrosis in Kirkland's case to an adverse reaction to the Silvadene application.[10] Dr. Keith Bjork, also a board-certified orthopedic surgeon, testified as Plum Creek's expert. Bjork expressed disagreement with Albracht's opinion, asserting that Kirkland's several "co-morbidities" instead were responsible for the skin death.[11]

---

[9] Albracht and Dr. Keith Bjork, Plum Creek's expert, testified live. Dr. Bruce Baker, who also treated Kirkland, testified by deposition.

[10] Albracht testified, "the application of the Silvadene resulting in a reaction, ultimately led to the full thickness skin loss and necrosis and subsequent need for amputation." At the same time, he later agreed it was "possible" Kirkland would have suffered the skin loss and amputation even without the application of Silvadene.

[11] Asked why he disagreed with Albracht's opinion focusing on the application of Silvadene, Bjork said, "Well, for one, I think there's a multitude of comorbidities that

After review of the record, we conclude Plum Creek's contention that Albracht had no basis for his opinion on proximate cause disregards testimony the trial court could have considered significant, testimony indicating the pattern of necrosis Kirkland experienced was unusual. Albracht cited the pattern of the "full thickness" necrosis among the factors indicating to him that a reaction to Silvadene caused the necrosis. He described the necrosis present as having a "circumferential nature," meaning, he said, it "went around the extremity in its entirety." He told the court it was "not uncommon with fracture blisters and trauma to have isolated areas of . . . skin loss." But, he indicated, he had never seen a fracture blister develop circumferentially. Later pressed on cross examination about the likelihood of Kirkland suffering the eventual loss of his leg even had Silvadene never been applied, Albracht responded, "The . . . location of where he had the skin death did not match up with where his fracture occurred, so it would be unusual for that level of necrosis to occur in the pattern and distribution that it did, based on his fracture." He agreed, however, that such a pattern was not impossible.

Albracht said his opinion also was based on Kirkland's report, supported by his friend Glennis Innes's report, that the Plum Creek nurses applied Silvadene twice, not once as the medical records indicate. He similarly relied on Kirkland and Innes's report

_____

attributed to the end result, not the least of which is age, hypertension, diabetes, peripheral vascular disease, the trauma itself, the subsequent surgery, the DVT. The list is large. And I have never seen the application of Silvadene cause a reaction like that. I can't imagine that the application of Silvadene was ever done in a circumferential manner because that's not the way Silvadene is applied." He further testified that given the trauma to Kirkland's leg and the other factors, amputation was the likely outcome with or without the Silvadene.

that the cream was applied to his entire leg from knee to ankle, while the nursing note of a single application says Silvadene was "applied to blisters." And lastly he accepted Kirkland and Innes's report that the application of Silvadene caused the skin on Kirkland's leg to burn. Kirkland testified his leg was "[j]ust burning and burning and burning . . . it just hurt -- just burned so bad it just -- like it was on fire." The nursing note, to the contrary, records that Kirkland "felt better" after the application of Silvadene. The trial court, considering the weight to give to Albracht's testimony, saw the medical records and heard the testimony of Kirkland and Innes, and was thus in a position to resolve for itself the fact issues implicit in Albracht's opinion.

A medical journal article also is in evidence. It describes a number of studies of patients treated with silver sulfadiazine. Although it is difficult to compare the studies with Kirkland's circumstance in any detail, the article contains statements the trial court could have taken as supporting Albracht's opinion Silvadene caused his symptoms.[12] And as noted, the manufacturer's package insert for Silvadene is in evidence. It describes adverse reactions and contraindications.[13] At the least, the trial court could

---

[12] Journal of Burn Care & Research, The Side Effects of Silver Sulfadiazine, Fuller, Frederick W., M.D., 30(3):464-470 (May/June 2009). The article contains the statement, "The sulfonamide drugs may cause rare and catastrophic side effects, including anaphylaxis, toxic epidermal necrolysis (Stevens Johnson syndrome), and agranulocytosis." It also states, "An allergic reaction may occur in [silver sulfadiazine cream]-treated burn patient with a known sulfa allergy."

[13] One of the four paragraphs in the section of the insert describing "Adverse Reactions" reads: "Other infrequently occurring events include skin necrosis, erythema multiforme, skin discoloration, burning sensation, rashes, and interstitial nephritis." The section of the insert entitled "Contraindications" states in part and without elaboration that the cream "is contraindicated in patients who are hypersensitive to silver sulfadiazine or any of the other ingredients in the preparation."

have concluded from the medical literature before it that reactions such as that Albracht posited can and do occur, particularly in patients like Kirkland with an allergy to sulfa.[14]

We focus not on the correctness of Albracht's opinion testimony, but on the reliability of the analysis he used to reach his conclusion. *See GMC v. Burry*, 203 S.W.3d 514 (Tex. App.—Fort Worth 2006, pet. denied) (citations omitted). The testimony of the three physicians shows several possible causes for the necrosis that led to amputation, only one of which establishes that Plum Creek's negligence caused Kirkland's injury. The question before us thus is a relatively narrow one. The question is whether Albracht explained to the trial court why his conclusion is superior based on verifiable medical evidence, rather than merely his opinion. *Jelinek*, 328 S.W.3d at 536.

We find he did so. The trial court could have credited as significant the medical evidence of Kirkland's allergy to sulfa, a factor not addressed directly by Plum Creek's expert Bjork. By its resolution of factual disputes raised by the evidence before it, the trial court also could have determined that the Silvadene was applied in a circumferential manner over Kirkland's leg, contrary to Bjork's stated assumption that it

---

[14] The findings from the medical literature alone distinguish Albracht's opinion from that of the expert in *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 906 (Tex. 2004), who cited no publications supporting his theory of the behavior of the detached left rear wheel. *See E.I. du Pont de Nemours v. Robinson,* 923 S.W.2d 549, 557 (Tex. 1995) (including among its factors indicating reliability the extent to which the theory has been subjected to peer review and publication and the non-judicial uses which have been made of the theory or technique). Testimony showed a medical doctor would not prescribe Silvadene to a patient with an allergy to sulfa because it is contraindicated.

was not so applied, but consistent with Albracht's opinion.[15] The record also contains verifiable medical evidence, including medical records and photographs of Kirkland's leg prior to amputation, reflecting the pattern of "full thickness" necrosis Albracht discussed during his testimony. Bjork, an orthopedic surgeon of considerable experience, told the court he had seen many patients with "significant eschars," but was "not sure I've seen a circumferential one like this." The trial court further could have taken his statement as supportive of the significance Albracht attached to his observation of necrosis at locations he found incongruent with Kirkland's wounds. And finally, the trial court could have considered it significant that Bjork, despite his earlier expressions of opinion, later expressed some agreement with Baker's testimony it is "conceivable" that factors including the Silvadene application worked together to cause the need for debridement and lack of healing that led to amputation.[16]

Although Plum Creek may raise its contention on appeal that Albracht's opinion was baseless and speculative on its face, we cannot agree with the contention. Albracht's testimony gave the trial court more than his credentials and a subjective

---

[15] As noted, Bjork's expression of opinion before the court included the statement, "I can't imagine that the application of Silvadene was ever done in a circumferential manner because that's not the way Silvadene is applied."

[16] Baker's deposition, read at trial, contains his statement, "Based on my experience I could not say that an infection led to the need for the debridement or that the Silvadene led to the need for the debridement or that poor small vessel circulation to the leg led to the need for debridement and failure to heal, and I can't say that any of those in isolation or altogether."

Asked if "all three of them working together . . . could have caused this," Baker responded, "It's conceivable." Asked during his testimony if he agreed with Baker's statement, Bjork answered, "I think that's a reasonable statement."

13

opinion. He expressed a basis in medicine for his opinion, satisfying the minimum requirements for reliability. *See Constancio v. Shannon Med. Ctr.,* No. 03-10-00134-CV, 2012 Tex. App. LEXIS 4339, *7-37 (Tex. App.—Austin May 22, 2012) (mem. op.) (applying reliability standards).

We resolve Plum Creek's second issue against it.

Medical Expenses

In its third point, Plum Creek challenges the legal and factual sufficiency of the evidence supporting the trial court's finding concerning one element of Kirkland's damages, the amount of past medical expenses. The trial court's findings include the following: "10. The reasonable and necessary medical and home renovation expenses incurred and paid on behalf of Cleo Kirkland for the injuries proximately caused by the negligence of the Defendant are $13,000.00 (Home Renovations) and $186,897.15 (medical)."

Findings of fact in a bench trial have the same force as a jury's verdict upon jury questions. *City of Clute v. City of Lake Jackson,* 559 S.W.2d 391, 395 (Tex. Civ. App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.). When the trial court acts primarily as a fact finder, the findings are reviewable for legal and factual sufficiency under the same standards that are applied in reviewing evidence supporting a jury's answer. *Whitehead v. University of Tex. Health Science Ctr.,* 854 S.W.2d 175, 178 (Tex. App.—San Antonio 1993, no writ); *Zieben v. Platt,* 786 S.W.2d 797, 799 (Tex. App.—Houston [14th Dist.] 1990, no writ).

14

The parties stipulated to the necessity of the medical care Kirkland received and the reasonableness of the amounts incurred and paid. Plum Creek contends Kirkland's evidence fails to distinguish between treatment Kirkland would have required in any event because of his crush injury and that required by the skin necrosis and the subsequent amputation. *See Texarkana Mem'l Hosp. v. Murdock*, 946 S.W.2d 838, 840 (Tex. 1997) (plaintiff may recover only for medical expenses specifically shown to result from treatment made necessary by the negligent acts or omissions of the defendant, where such a differentiation is possible); *Morrell v. Finke*, 184 S.W.3d 257, 287-88 (Tex. App.—Fort Worth 2005, pet. ref'd) (applying rule).[17]

Kirkland presented his evidence of past medical expenses through his exhibit 30, and the testimony of Albracht and Bjork. Exhibit 30 is a list of expenses by provider, dates of treatment and amount. The record reflects the trial court was made aware of the issue of expenses for treatment of conditions perhaps unrelated to the skin necrosis. Kirkland suggested that the court omit from the damage calculation three items of treatment contained on the exhibit, and the trial court did so. The court also heard Albracht's testimony to the effect that the treatment of the infectious disease specialist, the debridement, the subsequent wound care, the insertion of a percutaneous epigastric tube, and the amputation and its related hospitalization all were related to the skin necrosis.

In its brief, Plum Creek attacks in particular the evidence showing that expenses incurred in Kirkland's treatment at The Arbors, a rehabilitation facility, were related to

---

[17] Neither party cites authority in their discussions of Plum Creek's third issue. We address their contentions as we perceive them.

Plum Creek's negligent conduct. Exhibit 30 indicates Kirkland resided in The Arbors for a period of almost three months, beginning about six weeks after the amputation. Bjork also was asked about treatments needed because of "complications" with Kirkland's leg. He was directly asked about Kirkland's treatment at The Arbors. Although his testimony in that regard is somewhat unclear, we think the trial court could have understood him to express agreement that Kirkland's treatment at The Arbors was made necessary because of the amputation.

Moreover, we find the trial court could have considered the difficulty of differentiating between the treatments made necessary by Plum Creek's actions and those that would otherwise have been necessary. *Murdock*, 946 S.W.2d at 840 (differentiation is required where possible).

Concluding the trial court had before it sufficient evidence on which to base its award of damages for past medical expenses, we overrule Plum Creek's third point.

Conclusion

Having overruled each of Plum Creek's issues, we affirm the judgment of the trial court.


James T. Campbell
Justice



.


16